IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| MARIO AGUILAR,<br>Institutional ID No. 02248696<br>SID No. 7295388 | §<br>§<br>§<br>§ | |
| Plaintiff, | §<br>§<br>§ | |
| v. | §<br>§ | CIVIL ACTION NO. 5:22-CV-306-BQ |
| TEXAS DEPARTMENT OF<br>CRIMINAL JUSTICE, *et al.*, | §<br>§<br>§<br>§ | |
| Defendants. | § | |

## REPORT AND RECOMMENDATION

Proceeding pro se and *in forma pauperis*, Plaintiff Mario Aguilar filed this action under 42 U.S.C. § 1983, claiming violations of his constitutional rights while incarcerated in the Texas Department of Criminal Justice (TDCJ) John Montford Unit. Compl. 5, ECF No. 1.[1] The United States District Judge transferred this case to the undersigned United States Magistrate Judge for further proceedings. ECF No. 15. The undersigned thereafter reviewed Aguilar's Complaint, as well as authenticated records from TDCJ, and held an evidentiary hearing on July 20, 2023, in accordance with *Spears v. McCotter*, 766 F.2d 179, 181–82 (5th Cir. 1985). ECF Nos. 22, 27.

Not all parties have consented to proceed before the undersigned magistrate judge.[2] In accordance with the order of transfer, the undersigned enters this Report and recommends that the United States District Judge dismiss with prejudice all of Aguilar's claims, except those against

---

[1] Page citations to Aguilar's pleadings refer to the electronic page number assigned by the Court's electronic filing system.

[2] At the *Spears* hearing, Aguilar verbally consented to proceed before a magistrate judge. To "memorialize his intent," the Court sent Aguilar a form to sign and return. ECF No. 25. The Court advised Aguilar that "[a]bsent return of the executed consent form, [he] will not have consented to proceed before a Magistrate Judge." *Id.* Aguilar has not returned the executed form.

Defendants in their official capacities and for deliberate indifference to serious medical needs against John Does #2 and #3 (Montford Unit correctional officers), Lendal K. Henderson, Jennifer Fridlington, and Jane Doe #2 (a nurse at the Montford Unit) in their individual capacities. As to Aguilar's claims against Defendants in their official capacities, the undersigned recommends those be dismissed without prejudice. The undersigned further recommends that the district judge require John Does #2 and #3, Lendal K. Henderson, Jennifer Fridlington, and Jane Doe #2 to answer or otherwise plead as to Aguilar's deliberate indifference claims.

## I.      <u>Standard of Review</u>

A court must dismiss a complaint filed *in forma pauperis* by a prisoner against a government entity or employee if the court determines that the complaint is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B) (2017); *see also* § 1915A(b) (applying section to any suit by a prisoner against certain governmental entities, regardless of whether the prisoner is proceeding *in forma pauperis*). A frivolous complaint lacks any arguable basis, either in fact or in law, for the wrong alleged. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). A complaint has no arguable basis in fact if it rests upon clearly fanciful or baseless factual contentions, and similarly lacks an arguable basis in law if it embraces indisputably meritless legal theories. *See id.* at 327; *Geiger v. Jowers*, 404 F.3d 371, 373 (5th Cir. 2005) (per curiam). When analyzing a prisoner's complaint, the court may consider reliable evidence such as the plaintiff's allegations, responses to a questionnaire, and authenticated prison records. *See Wilson v. Barrientos*, 926 F.2d 480, 483–84 (5th Cir. 1991); *see also Berry v. Brady*, 192 F.3d 504, 507 (5th Cir. 1999) (explaining that responses to a questionnaire or testimony given during an evidentiary hearing are incorporated into the plaintiff's pleadings); *Banuelos v. McFarland*, 41 F.3d 232, 234

(5th Cir. 1995) (per curiam) (holding that courts may dismiss prisoners' *in forma pauperis* claims as frivolous based on "medical and other prison records if they are adequately identified or authenticated" (internal quotation marks omitted)).

In evaluating the sufficiency of a complaint, courts accept well-pleaded factual allegations as true, but do not credit conclusory allegations or assertions that merely restate the legal elements of a claim. *Chhim v. Univ. of Tex. at Austin*, 836 F.3d 467, 469 (5th Cir. 2016) (per curiam).  And while courts hold pro se plaintiffs to a more lenient standard than lawyers when analyzing complaints, such plaintiffs must nevertheless plead factual allegations that raise the right to relief above a speculative level.  *Id*. (citing *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002)).

## II.    Discussion

### A.  Aguilar's Allegations

Aguilar asserts claims against the following Defendants:  (1) Warden Ivey; (2) Raymond C. Odiaka, P.M.H.N.P. [hereinafter NP Odiaka]; (3) John Doe #1, a correctional officer (CO) [hereinafter John Doe CO #1]; (4) John Doe #2 [hereinafter John Doe CO #2]; (5) John Doe #3 [hereinafter John Doe CO #3]; (6) Jane Doe #1, CO [hereinafter Jane Doe CO]; (7) Krystal L. Sherrill, F.N.P.;[3] (8) Jane Doe #2, nurse [hereinafter Jane Doe Nurse]; (9) Jennifer Fridlington, nurse; and (10) Lendal K. Henderson, CO.[4]  ECF No. 30-1, at 5–11 [hereinafter Am. Compl.]; Tr.

---

[3] Aguilar refers to Sherrill as both an M.D. and an F.N.P.  ECF No. 30-1, at 3, 7, 14.  The authenticated records reflect that she is a Family Nurse Practitioner (FNP).  The Court therefore refers to her as NP Sherrill.

[4] In his original Complaint, Aguilar also named TDCJ and/or the Montford Unit as a Defendant.  Compl. 1, 3.  He does not include TDCJ as a defendant in his Amended Complaint.  *See* ECF No. 30-1.  But even if Aguilar intends to sue TDCJ, as he stated at the *Spears* hearing (Tr. 2:46:44–:47:45), his claim would fail for the reasons stated in Section II.B herein.  *See also Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 617 (2002) (providing that neither states nor state agencies—i.e., the TDCJ Montford Unit—are "persons" against whom a § 1983 claim for money damages can be asserted (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989))).

2:46:44–:47:45.[5]  He sues each Defendant in their individual and official capacities.  Am. Compl. 5–7.

Aguilar alleges that on October 4, 2022, he attended a psychiatric appointment with NP Odiaka.  *Id.* at 12.  In response to Aguilar's complaint that he was experiencing headaches due to his medication, NP Odiaka changed Aguilar's medication to Risperidone—a medication he had not previously taken.  *Id.*; Tr. 2:19:45–:21:11.  Aguilar asserts that NP Odiaka did not advise him of Risperidone's potential side effects.  Am. Compl. 12; Tr. 2:22:12–:26:00.

Aguilar took the first dose of Risperidone between 7:00 and 9:00 p.m. on October 4.  Am. Compl. 12.  About seven hours later, between 2:00 and 4:00 a.m. on October 5, Aguilar awoke with an erection.  *Id.*  He went back to sleep, and several hours after that (between 8:00 and 10:30 a.m.) "[he] woke-up and still had an erection," so he notified John Doe CO #1.[6]  *Id.*  Aguilar told Doe #1 that he believed he was having a reaction to Risperidone, specifically described the reaction, and asked Doe to notify medical staff.  Tr. 2:26:02–:31:03; Am. Compl. 12–13.

At the *Spears* hearing, Aguilar stated that Doe CO #1 responded that he could not help Aguilar but that "he would tell the nurse" assigned to the pod.  Tr. 2:26:02–:31:03.  Aguilar further testified that to his knowledge, Doe CO #1 relayed Aguilar's request for treatment to the medical department because later, Nurse Fridlington came to his cell and offered to provide non-aspirin— e.g., ibuprofen.  Tr. 2:31:58–:32:41.  In his Amended Complaint, however, Aguilar now asserts that Doe CO #1 "delayed in notifying medical[,] if he did at all."  Am. Compl. 13.

---

[5] Citations to the transcript reference the Court's audio recording of the *Spears* hearing held July 20, 2023.  Testimony from a *Spears* hearing "amplif[ies] the allegations in the prisoner's complaint" and "becomes a part of the total filing by the *pro se* applicant."  *Eason v. Holt*, 73 F.3d 600, 602 (5th Cir. 1996).  Even though Aguilar amended his original Complaint after the *Spears* hearing, the Court nevertheless considers his testimony in conjunction with the amendment.  *Id.* at 603 ("[T]he relevant *Spears* testimony remained a part of the pleadings after [prisoner] amended his complaint, even though the amended complaint itself superseded the original complaint under the well-settled law of this circuit.").

[6] Aguilar described John Doe CO #1 as a Caucasian male between 50 and 60 years old, who is about six feet tall and weighs 250 pounds.  Tr. 2:26:02–:31:03.  Aguilar said that Doe CO #1 worked the 6:00 a.m. to 6:00 p.m. shift.  *Id.*

Regardless, Aguilar acknowledges that Nurse Fridlington first responded to his requests for care between 10:00 and 11:00 a.m. on October 5.  Tr. 2:31:58–:32:41.  Aguilar alleges that he told Nurse Fridlington that his medication had been changed and believed he was having a reaction to the medication, which began during the early morning hours of October 5.  Tr. 2:34:10–:37:55. Aguilar also asserts that he asked Nurse Fridlington to (1) examine him and (2) take him to a physician because the reaction was painful.  *Id.*  She apparently did not examine him but provided ibuprofen as he requested to relieve his pain.  Tr. 2:31:58–:32:41, 2:34:10–:37:55.  And in response to Aguilar's request to see a doctor, Nurse Fridlington purportedly told him that she would make an "entry," which Aguilar understood meant she would place a request for a doctor to examine him.  Tr. 2:34:10–:37:55.

Aguilar avers that he told John Doe CO #1, as well as Jane Doe CO, during the day that the pain was getting worse.  Tr. 2:26:02–:31:03; Am. Compl. 13.  Nurse Fridlington visited his cell two more times on October 5—around 2:00 p.m. and between 5:00 and 6:00 p.m.—and provided him doses of ibuprofen.  Tr. 2:34:56–:40:45.  At the 2:00 p.m. visit, Aguilar contends that he again asked Nurse Fridlington if he could see a doctor, but she responded that the medical department had not yet called Aguilar for an appointment.  *Id.*  When Nurse Fridlington provided him with the third dose of ibuprofen, he inquired why he had not been called to the medical department, and Nurse Fridlington told him that it was "too late" to go to medical.  *Id.*  Aguilar asserts that Nurse Fridlington violated his constitutional rights by denying him medical treatment for priapism.[7]  Tr. 2:40:47–:42:20.

When the second-shift staff came on duty (apparently around 6:00 p.m. on October 5), Aguilar advised John Doe COs #2 and #3, along with Jane Doe Nurse, "that his medication was

---

[7] "Priapism" is a "[p]ersistent erection of the penis, accompanied by pain and tenderness . . . ." *Priapism*, STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).

recently changed, he was experiencing a side effect" that had lasted more than twelve hours, "he was in severe pain, he wanted to see a doctor, and that it was an emergency." Am. Compl. 13. According to Aguilar, they did not obtain or provide medical care. *Id.*

The next day, October 6, Aguilar encountered CO Henderson. *Id.* Aguilar avers that after informing CO Henderson of his medical issue, he refused to obtain medical care, but at the *Spears* hearing he conceded that Henderson ultimately called Nurse Sanchez. Am. Compl. 13–14 (indicating it was only because his cellmate gained CO Henderson's attention did Henderson finally call for medical staff); Tr. 2:42:51–:46:00 (stating that CO Henderson "took it on hisself [sic all]" to call Nurse Sanchez). Nurse Sanchez observed Aguilar's condition, asked how long he had been experiencing the side effect, and obtained an examination for Aguilar by the medical department. Am. Compl. 14.

Once in the medical department, Nurse Page (whom Aguilar does not name as a defendant) communicated with NP Sherrill, who apparently advised Nurse Page to transport Aguilar to the emergency room. Am. Compl. 14; Tr. 2:49:08–:51:22. Aguilar stated that he arrived at the medical department around noon. Tr. 2:49:08–:51:22. He further asserted that Nurse Page advised him around 2:00 p.m. that he would be taken to the hospital, and at "14:11," he was transported. Tr. 2:49:08–:51:22. But in his Amended Complaint, Aguilar contends that "Defendants delayed for over four hours transferring [him] to" University Medical Center (UMC) in Lubbock. Am. Compl. 14.

At UMC, Aguilar was treated and underwent two surgeries for priapism. *Id.* at 14–15; Tr. 2:40:47–:42:20. According to Aguilar, due to the delay and lack of treatment he: (1) has suffered pain during and after the incident; (2) now has "a disfigured penis"; and (3) suffers from erectile

dysfunction and/or impotency.  Am. Compl. 15; Tr. 2:40:47–:42:20.  He seeks monetary damages. Am. Compl. 12, 16.

### B.  Aguilar's claims against Defendants in their official capacities must be dismissed.

Aguilar sues all Defendants in their individual and official capacities.  Am. Compl. 5–7. An official capacity suit generally amounts to a suit against the entity of which the officer is an agent—e.g., a claim against a TDCJ employee in his or her official capacity equates to a claim against TDCJ and, therefore, a claim against the state of Texas.  *See Hafer v. Melo*, 502 U.S. 21, 25 (1991) (stating "that official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent" (internal quotation marks and citation omitted)).  TDCJ, however, is immune from claims for money damages.  *See Talib v. Gilley*, 138 F.3d 211, 213 (5th Cir. 1998) ("As an instrumentality of the state, the TDCJ[] is immune from a suit for money damages under the Eleventh Amendment."); *Jennings v. Abbott*, 538 F. Supp. 3d 682, 691 (N.D. Tex. 2021) ("The State of Texas has not waived its sovereign immunity from section 1983 claims."); *Dottin v. Tex. Dep't of Crim. Just.*, No. 1:13-CV-710, 2014 WL 11498078, at *11 (E.D. Tex. Nov. 25, 2014) (explaining that "TDCJ is an arm of the state of Texas and, as such, is immune from [suit] . . . under the Eleventh Amendment"), *aff'd*, 627 F. App'x 397 (5th Cir. 2015).

Thus, Defendants are entitled to Eleventh Amendment immunity regarding Aguilar's official capacity claims for monetary damages.  *See Cox v. Texas*, 354 F. App'x 901, 902 (5th Cir. 2009) (per curiam) ("Eleventh Amendment immunity applies to all suits brought against States and their agencies . . . regardless of the relief sought." (internal quotation marks and citation omitted)).  The undersigned recommends the district judge dismiss without prejudice Aguilar's official capacity claims due to a lack of jurisdiction.

**C.  Aguilar's claim that Warden Ivey failed to properly supervise his staff is meritless.**

Aguilar asserts that Warden Ivey "fail[ed] to supervise his agents," resulting in Aguilar's harm.  Am. Compl. 8.  Aguilar further testified at the *Spears* hearing that Warden Ivey did not enforce institutional procedures.  Tr. 2:16:30–:19:37.  But he acknowledged that he is suing Warden Ivey merely because the warden is in charge of the Montford Unit.  *Id.*

It is well established that supervisory officials are not liable for the acts of their subordinates unless:  (1) they affirmatively participated in an act that caused a constitutional deprivation, or (2) they implemented an unconstitutional policy that resulted in injury to the plaintiff.  *Mouille v. City of Live Oak*, 977 F.2d 924, 929 (5th Cir. 1992) (citing *Thompkins v. Belt*, 828 F.2d 298, 303 (5th Cir. 1987)).  A prisoner must sufficiently allege facts showing either personal involvement or implementation of an unconstitutional policy to make a supervisor responsible under § 1983, as prison supervisors "are not liable for the actions of subordinates on any theory of vicarious liability."  *Thompkins*, 828 F.2d at 303.  A plaintiff can prove "a government's policy or custom" through methods other than reference to formal policy, such as showing the existence of an unconstitutional practice that is so "persistent and widespread" as to constitute a de facto policy or custom.  *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658, 690–91, 694 (1978).  Plaintiffs face a high burden when claiming a level of pervasiveness sufficient to attribute an informal policy to a government entity or supervisory official.  *Bennett v. City of Slidell*, 728 F.2d 762, 768 n.3 (5th Cir. 1984) ("Isolated violations are not the persistent, often repeated, constant violations that constitute custom and policy.").  Further, even if a plaintiff can prove implementation of a policy, supervisory liability only exists if "the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation."

*Thompkins*, 828 F.2d at 304 (internal quotation marks omitted) (quoting *Grandstaff v. City of Borger*, 767 F.2d 161, 169, 170 (5th Cir. 1985)).[8]

Aguilar does not contend that Warden Ivey personally participated in the alleged constitutional violation. Tr. 2:16:30–:19:37. Nor does Aguilar allege that Warden Ivey implemented an unconstitutional policy. *Id.* Instead, under a very liberal construction of Aguilar's allegations, he appears to aver that Warden Ivey failed to enforce *constitutional* policies, which resulted in his harm. *Id.* But without additional facts, Aguilar cannot state a viable claim. *See, e.g.*, *Crittindon v. LeBlanc*, 37 F.4th 177, 186 (5th Cir. 2022) (explaining that to state a viable supervisory liability claim, a prisoner must demonstrate, *inter alia*, that the defendant "had 'actual or constructive notice' that their failure to [act] . . . would result in constitutional violations," which is typically shown through "[a] pattern of similar constitutional violations" (citation omitted)); *Bennett*, 728 F.2d at 768 n.3 (noting that isolated constitutional violations almost never "constitute custom and policy"); *Sanchez v. Griffis*, 569 F. Supp. 3d 496, 516 (W.D. Tex. 2021) (dismissing plaintiff's claim against municipality in part because his "[c]omplaint focuse[d] on the single incident in which he was involved, rather than suggesting a persistent and widespread practice"). The undersigned therefore recommends the district judge dismiss Aguilar's claims against Warden Ivey.[9]

---

[8] The Fifth Circuit "has noted 'the close relationship between the elements of municipal liability and an individual supervisor's liability' and held that 'the same standards of fault and causation should govern.'" *Walker v. Upshaw*, 515 F. App'x 334, 339 n.19 (5th Cir. 2013) (per curiam) (quoting *Southard v. Tex. Bd. of Crim. Just.*, 114 F.3d 539, 551 (5th Cir. 1997)). For this reason, cases evaluating the policy elements for one will often cite cases construing the other. *See, e.g.*, *Thompkins*, 828 F.2d at 304 (supervisory liability) ("Supervisory liability exists even without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy 'itself is a repudiation of constitutional rights' and is 'the moving force of the constitutional violation.'" (quoting *Grandstaff*, 767 F.2d at 169, 170 (municipal liability))). This Court follows a similar track and relies on authority involving both municipal and supervisory liability in analyzing Aguilar's claim.

[9] And for these same reasons, Aguilar's attempt to add Bobby Lumpkin, Lannette Linthincum, Vickey Hay, Tedd Mitchell, Kemone Lindo, Tamarra Mason, Daniel Brossart, and Brittany Jordan—individuals with whom he does not claim he had interaction and that he generically alleges "fail[ed] to supervise" or train their subordinates—is futile. *See* Am. Compl. 5–10, 15.

**D. Aguilar has not pleaded facts demonstrating NP Odiaka violated his constitutional rights.**

Aguilar contends that NP Odiaka violated his constitutional rights "by failing to (1) warn Aguilar of" Risperidone's potential side effects and the general "risks" associated with the medication, and (2) "monitor Aguilar for any side effects after having prescribed him Risperidone." Am. Compl. 8; Tr. 2:22:12–:26:00. Aguilar acknowledges, however, that he (1) had never taken Risperidone previously, (2) had never experienced the side effect on any other medication that he suffered with Risperidone, and (3) did not personally report to NP Odiaka that he was experiencing the side effect. Tr. 2:19:45–:21:11. Aguilar only reported the reaction to NP Odiaka two months after the incident, in December 2022, when Aguilar attended an appointment. Tr. 2:21:57–:22:11.

The Constitution requires that prison officials provide adequate medical care. *Rogers v. Boatright*, 709 F.3d 403, 409 (5th Cir. 2013). An inmate seeking to establish a constitutional violation in regard to medical care must allege facts showing that prison officials were deliberately indifferent to his serious medical needs. *Morris v. Livingston*, 739 F.3d 740, 747 (5th Cir. 2014) (explaining that because "only the 'unnecessary *and wanton* infliction of pain' implicates the Eighth Amendment, a prisoner advancing such a claim must, at a minimum, allege 'deliberate indifference' to his 'serious' medical needs" (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991))). Deliberate indifference "is an extremely high standard to meet" (*Brewster v. Dretke*, 587 F.3d 764, 770 (5th Cir. 2009) (internal quotation marks and citation omitted)) and requires satisfaction of both an objective and a subjective component. *Rogers*, 709 F.3d at 410. An inmate must first prove objective exposure to a substantial risk of serious bodily harm. *Gobert v. Caldwell*, 463 F.3d 339, 345 (5th Cir. 2006). As to the subjective component, an official acts with deliberate indifference only where he (1) "knows [the] inmate[] face[s] a substantial risk of serious harm" and

(2) "disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994); *Gobert*, 463 F.3d at 346; *see also Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999) (per curiam) (stating that prison official is not liable for denial of medical treatment unless he knows of and disregards an excessive risk to inmate health or safety).

An official's "failure to alleviate a significant risk that the official should have perceived, but did not, is insufficient to show deliberate indifference." *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001) (alterations and internal quotation marks omitted) (quoting *Farmer*, 511 U.S. at 838). "[D]eliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." *Thompson v. Upshur Cnty.*, 245 F.3d 447, 459 (5th Cir. 2001). Instead, an official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Brewster*, 587 F.3d at 770 (quoting *Farmer*, 511 U.S. at 837); *see Lawson v. Dallas Cnty.*, 286 F.3d 257, 262 (5th Cir. 2002) (holding that deliberate indifference is a "subjective inquiry," and inmate must show prison official was actually aware of risk of harm and consciously ignored it).

Allegations of malpractice, negligence, or unsuccessful treatment fail to establish deliberate indifference. *Gobert*, 463 F.3d at 346. Similarly, an inmate's disagreement with the medical treatment provided does not give rise to a constitutional claim (*Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997)), and a delay in delivering medical care creates constitutional liability only where the alleged deliberate indifference results in substantial harm. *Mendoza v. Lynaugh*, 989 F.2d 191, 193 (5th Cir. 1993). In sum, an inmate must demonstrate that prison staff "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs" to state a

viable Eighth Amendment claim for deliberate indifference to serious medical needs. *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985).

Aguilar's allegations against NP Odiaka amount to, at best, a claim for negligence or medical malpractice, which does not implicate the Constitution. Aguilar pleads no facts showing that NP Odiaka was aware of a significant risk of harm before he prescribed the medication or that Odiaka disregarded any such risk. *See* Am. Compl. 8, 12; Tr. 2:19:45–26:00. Instead, Aguilar contends that NP Odiaka failed to advise him of the "dangers" of taking Risperidone, including the medication's potential side effects, and did not monitor him after prescribing the medication. Am. Compl. 8, 12; Tr. 2:19:45–26:00. Aguilar acknowledges, however, that NP Odiaka changed his medication in response to Aguilar's complaint that he was experiencing headaches on his original medication. Tr. 2:22:12–:26:00. These allegations do not amount to deliberate indifference. *See, e.g.*, *Campbell v. Brown*, 756 F. App'x 386, 389 (5th Cir. 2018) (per curiam) ("Mere negligence in diagnosing or treating a medical condition does not amount to deliberate indifference."); *Morgan v. Tex. Dep't of Crim. Just. McConnell Unit*, 537 F. App'x 502, 507 (5th Cir. 2013) (per curiam) ("While prescribing . . . treatments that cause serious side effects might amount to malpractice, this allegation, without a further showing of deliberate indifference to serious medical needs, does not rise to the level of a constitutional violation."); *Dallas v. Stalder*, No. 02-31056, 2003 WL 21756645, at *1 (5th Cir. Jun 24, 2003) (holding "[prisoner's] claim that prison doctors failed to advise him of the side effects of medication, for which he received medical care, [wa]s not cognizable under 42 U.S.C. § 1983"). The undersigned therefore recommends the district judge dismiss Aguilar's claims against NP Odiaka.

**E. Aguilar's allegation that John Doe CO #1 and Jane Doe CO were deliberately indifferent does not survive screening, but his contention that John Doe COs #2 and #3 and CO Henderson acted with deliberate indifference should proceed.**

Aguilar alleges that John Doe COs #1–3, Jane Doe CO, and CO Henderson either ignored or did not take seriously his complaints that he was suffering a painful reaction to Risperidone. Am. Compl. 9–11, 13–14; Tr. 2:26:02–:34:09 (discussing allegation against Doe CO #1), 2:42:51–:46:00 (explaining claim against CO Henderson).

Initially, the Court observes that it asked Aguilar at the *Spears* hearing whether he intended to sue each of the foregoing Defendants, whom he referenced in his original Complaint. Tr. 2:26:02–:31:03, 2:42:22–46:00; *see* Compl. 5–7. The only individual, of those listed herein, that Aguilar stated he wanted to sue was Doe CO #1. Tr. 2:26:02–:31:03; *see also* Tr. 2:46:44–:47:45 (confirming near the end of the hearing that he is suing TDCJ/Montford Unit, Warden Ivey, John Doe #1, and Nurse Fridlington). Nevertheless, the Court liberally construes the allegations in Aguilar's subsequently filed Amended Complaint as reflecting that he now intends to sue John Doe COs #2–3, Jane Doe CO, and CO Henderson. *See* Am. Compl. 6–11 (listing the foregoing individuals as Defendants and describing their alleged wrongful acts).

*1. John Doe CO #1 and Jane Doe CO*

Turning to the merits of Aguilar's claims, he has not pleaded facts demonstrating John Doe CO #1 and Jane Doe CO were deliberately indifferent. Aguilar alleges that he told each Defendant that he was suffering a reaction to medication and/or that he needed medical treatment. *Id.* at 9–11, 13–14. But he does not plead facts showing that John Doe CO #1 or Jane Doe CO knew he faced a substantial risk of serious harm and failed to take reasonable steps to abate it.

First, Aguilar avers that he told John Doe CO #1 the morning of October 5 that "he was experiencing a side effect, he ha[d] had an erection for over 5–6 hours, and that it was an

emergency." Am. Compl. 13. Aguilar concedes that, in response, John Doe CO #1 contacted medical staff, and Nurse Fridlington ultimately visited Aguilar cell-side. Tr. 2:26:02–:32:41. Aguilar makes the conclusory assertion that John Doe CO #1 "delayed" notifying medical staff of his condition, but Aguilar has not pleaded *facts* reflecting that any delay between his speaking with Doe and Nurse Fridlington's arrival were due to Doe CO #1 intentionally ignoring Aguilar's complaints or failing to timely communicate with medical staff as opposed to, for example, Nurse Fridlington's availability. *See* Am. Compl. 13; Tr. 2:26:02–:34:09.

Aguilar also faults John Doe CO #1 and Jane Doe CO for not calling medical to examine him after Nurse Fridlington's first visit on October 5. Am. Compl. 13; Tr. 2:32:41–:34:09. But he acknowledges that Nurse Fridlington visited him two more times that day. Tr. 2:34:56–:40:45. Aguilar pleads no facts reflecting that John Doe CO #1 or Jane Doe CO knew of a substantial risk of harm left unaddressed by Nurse Fridlington, or that they should have recognized an additional risk following her evaluations. *See* Am. Compl. 12–13; Tr. 2:26:02–:34:09; *cf. Thompson v. Tex. Dep't of Crim. Just.*, 67 F.4th 275, 282 (5th Cir. 2023) (concluding there was no deliberate indifference where "pleadings show[ed] that [defendant nurse] relied on [another nurse's] earlier examination to conclude there was 'nothing wrong' with [prisoner]"); *Grumbles v. Livingston*, 706 F. App'x 818, 819 (5th Cir. 2017) (per curiam) (affirming dismissal of prisoner's medical care claim, where although his "liver ultrasound was rescheduled on more than one occasion, the scheduling delays were, at most, the result of negligence"); *Hare v. City of Corinth*, 74 F.3d 633, 649 (5th Cir. 1996) ("Deliberate indifference, *i.e.*, the subjective intent to cause harm, cannot be inferred from a prison guard's failure to act reasonably." (citation omitted)); *Wesson v. Oglesby*, 910 F.2d 278, 284 (5th Cir. 1990) (holding prisoner failed to state deliberate indifference claim

against prison guards, where he acknowledged that nurse examined his wrist injury and "told him his wrists would be all right").

While Aguilar also avers that he interacted with Jane Doe CO on October 6, he does not allege that he asked her to obtain medical care for him. *See* Am. Compl. 13 (alleging only that he requested medical care from Jane Doe CO and John Doe CO # 1 on *October 5*, when Aguilar was treated by Nurse Fridlington three times that day). Likewise, he pleads no specific facts showing that she knew he faced a substantial risk of serious harm *and* failed to take reasonable measures to abate it. *Id.*

The essence of Aguilar's complaint against John Doe CO #1 and Jane Doe CO is that they should have called a doctor or done more for him. *See* Am. Compl. 13; Tr. 2:32:41–:34:09. The Fifth Circuit has consistently recognized, however, that "deliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm" (*Thompson*, 245 F.3d at 459), particularly where a layman has contacted medical concerning injury or illness. In sum, Aguilar has failed to plead facts showing that John Doe CO #1 and Jane Doe CO deliberately ignored him or wantonly disregarded his serious medical need. For these reasons, the undersigned recommends the district judge dismiss Aguilar's deliberate indifference claim against John Doe CO #1 and Jane Doe CO.

   *2.  John Doe COs #2 and #3 and CO Henderson*

Aguilar's claims against John Doe COs #2 and #3 and CO Henderson, however, require a different result, at least for screening purposes. Aguilar contends that he spoke with Doe COs #2 and #3 sometime after 6:00 p.m. on October 5. Am. Compl. 13. He told them "that his medication was recently changed, . . . he ha[d] had an erection *for over 12 hours*, he was in severe pain, he

wanted to see a doctor, and that it was an emergency." *Id.* (emphasis added).[10]  According to Aguilar, however, Doe COs #2 and #3 "refused [him] medical care and delayed in notifying a doctor or did not notify a doctor at all." *Id.*  Aguilar maintains that neither officer provided nor attempted to procure *any* care.  *Id.*  Thus, Aguilar has pleaded sufficient facts at this stage to state a claim for deliberate indifference against John Doe COs #2 and #3.[11]  *See, e.g.*, *Easter v. Powell*, 467 F.3d 459, 464 (5th Cir. 2006) (per curiam) (refusing to provide any care may amount to deliberate indifference); *Randle*, 2017 WL 892493, at *7 (concluding plaintiff stated deliberate indifference claim against officer who allegedly knew plaintiff had been suffering from a painful erection "for nearly a week" but did not obtain care for plaintiff, instead telling him he would need to wait until medical staff arrived after the weekend).  The undersigned recommends the district judge require John Doe COs #2 and #3 to answer or otherwise plead to Aguilar's deliberate indifference claim.[12]

---

[10] Aguilar further states that he made the same report to Jane Doe Nurse, but he does not specify whether Doe Nurse was present with Doe COs #2 and #3 when he made the report or if she arrived at his cell in response to a request from Doe COs #2 and #3.  Am. Compl. 13.  The undersigned addresses Aguilar's claim against Doe Nurse in Section II.F *infra*.

[11] A legitimate question exists as to whether Defendants were subjectively aware that Aguilar's medical condition— priapism—constituted a serious risk of harm.  *Compare Cruz v. Dart*, No. 12-CV-6665, 2017 WL 1021992, at *8 (N.D. Ill. Mar. 16, 2017) (concluding at summary judgment that plaintiff had failed to establish, "apart from the nature of priapism itself," that his condition made "the need for medical care obvious to laypersons"), *with Randle v. Lockwood*, No. 6:15–CV–084–RP, 2017 WL 892493, at *4-5 (W.D. Tex. Mar. 6, 2017) (finding "it plausible that [correctional officer] subjectively knew that [p]laintiff faced a serious risk of bodily harm because of his priapism," where plaintiff alleged (1) he was in severe and obvious pain, (2) he "repeatedly complained to officers or told them that he needed medical attention," and (3) the "symptoms and hazards of priapism are well known to even lay-people due to persistent advertising campaigns for erectile dysfunction drugs" (internal quotation marks omitted)).  The undersigned concludes, however, that Aguilar has pleaded sufficient facts at this stage to support the conclusion that Defendants were subjectively aware of a substantial risk of serious harm.  *See* Am. Compl. 13 (claiming he told John Doe COs #2 and #3, as well as CO Henderson, that he was experiencing a prolonged erection (12 hours) and that "he was in severe pain"); *Hope v. Harris*, 861 F. App'x 571, 583 (5th Cir. 2021) (per curiam) ("Evidence that a risk was obvious or otherwise apparent may be sufficient to support an inference that the prison official was aware of the risk."); *Austin v. Johnson*, 328 F.3d 204, 210 (5th Cir. 2003) (concluding that defendants' "failure to call an ambulance for almost two hours while [plaintiff] lay unconscious and vomiting rises to the level of deliberate indifference," given the obvious nature of the risk).

[12] Because Aguilar filed his Amended Complaint after the Court conducted the *Spears* hearing, the undersigned has obtained no identifying information about John Doe COs #2 and #3.  By separate order, the undersigned will require Aguilar to provide the information in the event the district judge adopts the undersigned's recommendation.

The undersigned also recommends the district judge require CO Henderson to answer. Initially, the undersigned observes that Aguilar testified at the *Spears* hearing he did not intend to sue CO Henderson because he "did more for" Aguilar than Doe CO #1.  Tr. 2:42:51–:46:00. Moreover, Aguilar's contention in the Amended Complaint that CO Henderson "refused to notify medical of [his] condition" (Am. Compl. 13) contradicts his testimony that Henderson notified medical staff, and Nurse Sanchez arrived to examine Aguilar.  Tr. 2:42:51–:46:00; *see also* Am. Compl. 14 (failing to describe the timing between his conversations with CO Henderson and when Nurse Sanchez arrived).  What is more, Aguilar does not explain why, when "three nurses came to offer flu vaccine[s]," he did not ask them for medical care.[13]  Am. Compl. 13.

Regardless, liberally construing Aguilar's allegation as one for a delay in medical care results in the claim surviving screening.  According to Aguilar, CO Henderson acknowledged his request for medical care due to the prolonged side effect but purportedly did not contact medical. *Id.*  Thereafter, nurses came to administer flu shots, but CO Henderson allegedly still did not notify them of Aguilar's condition because Henderson "was waiting for the nurse."  *Id.*; Tr. 2:42:51– :46:00.  "At that time, Jane Doe [CO] told Henderson[,] '[h]e's been like that since yesterday.'" Am. Compl. 13.  "Aguilar later" reported his condition to a sergeant, and the sergeant told CO Henderson "to call medical."  Am. Compl. 13–14.  But Aguilar asserts that it was not until another inmate began "kicking the door" "to get attention" that CO Henderson reappeared, and Nurse Sanchez arrived cell-side sometime thereafter.  *Id.* at 14.  Aguilar concedes that CO Henderson ultimately called Nurse Sanchez.  Tr. 2:42:51–:46:00.

The foregoing facts, accepted as true, reflect that despite Aguilar's report that he had been experiencing "an erection for over 24 hours" and "was in severe pain," CO Henderson delayed in

---

[13] The authenticated records reflect that Aguilar received a flu shot, thereby indicating that he had direct contact with medical staff.

obtaining medical care, even after Jane Doe CO confirmed that Aguilar's condition was unchanged from the day prior.  Am. Compl. 13–14.  At this juncture, Aguilar has pleaded sufficient facts such that CO Henderson should be required to answer or otherwise plead to Aguilar's deliberate indifference claim.  *Cf. Dyer v. Houston*, 964 F.3d 374, 381–82 (5th Cir. 2020) (holding that plaintiff's deliberate indifference claim against officers survived summary judgment, where officers were aware of the cause of plaintiff's head trauma but failed to "seek medical attention," did not inform jail personnel about plaintiff's injuries, and told jail staff that plaintiff was "medically cleared" before arriving at jail); *Austin*, 328 F.3d at 210 (holding defendants' "failure to call an ambulance for almost two hours while [plaintiff] lay unconscious and vomiting" amounted to an unconstitutional delay, despite defendant's provision of first aid "at some point").

## F. The district judge should require Nurse Fridlington and Jane Doe Nurse to answer or otherwise plead to Aguilar's claim of deliberate indifference.

The undersigned likewise concludes Aguilar's claims against Nurse Fridlington and Jane Doe Nurse survive screening.  Each nurse was aware that Aguilar was experiencing a prolonged erection—potentially because of a reaction to a new medication—and "severe pain."  Am. Compl. 13–14; Tr. 2:34:10–:42:20.  Despite this knowledge, Nurse Fridlington only administered ibuprofen.[14]  Tr. 2:34:56–:40:45.  And Jane Doe Nurse allegedly provided no care at all.  Am. Compl. 13.  At this stage, the undersigned cannot conclude that Nurse Fridlington's and Jane Doe Nurse's conduct did not amount to deliberate indifference to Aguilar's serious medical need.  *See, e.g.*, *Thompson*, 67 F.4th at 281 ("Under exceptional circumstances, a prison official's knowledge of a substantial risk of harm may be inferred by the obviousness of the substantial risk." (brackets and citation omitted)); *Harris*, 198 F.3d at 159–60 (holding prisoner's allegation that doctor and

---

[14] Aguilar alleges, and the authenticated records indicate, that Nurse Fridlington did not document Aguilar's medical condition until October 6 at 2:05 p.m.—after Aguilar presented to the medical department with an erection that had lasted more than twenty-four hours.  *See* Am. Compl. 14.

nurses "ignored his urgent and repeated requests for immediate medical treatment for his broken jaw and his complaints of excruciating pain" stated an Eighth Amendment claim); *Easter*, 467 F.3d at 464 (explaining prisoner's allegation that nurse "refused to provide any treatment to, and ignored [his] complaints of, . . . severe chest pain [when] she knew [he] had a history of cardiac problems" crossed "the 'deliberate indifference' threshold"). Thus, the undersigned recommends the district judge require Nurse Fridlington and Jane Doe Nurse to answer or otherwise plead to Aguilar's claims.[15]

### G. Aguilar has not pleaded sufficient facts demonstrating Defendants unconstitutionally delayed obtaining care for him once he arrived in the medical department.

Aguilar explains that after arriving at the medical department, Nurse Page (whom he does not sue) contacted NP Sherrill to determine course of treatment. Am. Compl. 14. "Nurse Page informed Aguilar that he was going to" UMC per NP Sherrill's instructions. *Id.* Aguilar, however, offers conflicting assertions as to what happened next. At the *Spears* hearing, Aguilar testified that he arrived in medical around noon on October 6 and that "at 14:11" Montford officers transported him to UMC. Tr. 2:49:08–:51:22. He expressly denied *any* delay between when NP Sherrill ordered the transport and his transfer to UMC. *Id.* (responding "no" to Court's inquiry as to whether Aguilar was "alleging there was any type of delay from when they told [him he] would be taken to the hospital until" he was transported). In his Amended Complaint, however, he now contends that "Defendants delayed for over four hours in transferring Aguilar to UMC." Am. Compl. 14.

Aguilar's contradictory assertions make it difficult for the Court to determine what facts to accept as true in liberally construing his claims. It is well settled that courts need not accept as

---

[15] Because Aguilar filed his Amended Complaint after the Court conducted the *Spears* hearing, the undersigned has not obtained identifying information about Jane Doe Nurse. By separate order, the undersigned will require Aguilar to provide the information in the event the district judge adopts the undersigned's recommendation.

true contradictory assertions, which can render constitutional delay-in-medical-care claims "implausible on [their] face." *Mora v. Univ. of Tex. Sw. Med. Ctr.*, 469 F. App'x 295, 299 (5th Cir. 2012) (per curiam); *see Eubanks v. Mullen*, No. 94-10103, 1994 WL 724986, at *1 (5th Cir. Dec. 14, 1994) (per curiam) ("While the district court may not dismiss under § 1915(d) by simply electing to credit the defendant's account of events, the district court may conclude that the plaintiff is not credible if the plaintiff's account of the events is internally inconsistent."); *Joseph v. Foti*, No. 94-30019, 1994 WL 558848, at *3–4 (5th Cir. Sept. 26, 1994) (per curiam) (affirming district court's dismissal where plaintiff's allegations were internally inconsistent).

Here, however, the Court need not rely on this principle to conclude Aguilar's amended allegations fail to survive screening—his claims as to these Defendants are devoid of any factual support demonstrating deliberate indifference. Even accepting as true his conclusory assertion that "Defendants delayed for over four hours," he pleads no facts showing that any named Defendant—Montford Unit officers or medical staff—controlled the timing or were otherwise responsible for any delay in transport or how quickly he was seen at UMC. *See* Am. Compl. 14. For example, Aguilar pleads no facts showing when Nurse Page (whom he does not sue) called NP Sherill, how much time transpired from that call to when NP Sherill decided Aguilar should be transported and when he was transported, or the reason(s) for any delay that may have occurred during this process. His allegations contain no facts showing that NP Sherill—who was apparently not present (*id.*)—*knew* Aguilar faced a substantial risk of serious harm *and* disregarded the risk by failing to take reasonable measures to abate it. Nor has Aguilar shown that the other "Defendants" were even present after NP Sherrill directed his transport to UMC and thus, Aguilar has failed to demonstrate they were personally involved in any transportation issue. *See id.* For these reasons this claim should likewise be dismissed. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(explaining that a court need not accept as true "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" (citation omitted)); *see also Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983) ("Personal involvement is an essential element of a civil rights cause of action."); *Young v. TDCJ*, No. H-18-4050, 2020 WL 825614, at *8 (S.D. Tex. Feb. 19, 2020) (dismissing prisoner's denial of medical care claim, where prisoner did not plead "facts showing that any delay was attributable to [defendant], who" was responsible for medical care, not "arranging for the transport of prisoners . . . treated at" the hospital).

In sum, the undersigned recommends the district judge dismiss Aguilar's claim that Defendants delayed transporting him to UMC.[16]

### III.    Recommendation

For these reasons, the undersigned recommends that the United States District Judge dismiss with prejudice the following claims: (1) those against Warden Ivey; and (2) those for deliberate indifference to serious medical needs against NP Odiaka, John Doe CO #1, Jane Doe CO, and NP Sherrill. The undersigned further recommends that the district judge dismiss without prejudice Aguilar's claims against Defendants in their official capacities. Finally, the undersigned recommends that the district judge require John Doe COs #2 and #3, CO Henderson, Nurse Fridlington, and Jane Doe Nurse to answer or otherwise plead as to Aguilar's claims for deliberate indifference to serious medical needs against them in their individual capacities.[17]

---

[16] Although not expressly raised in his Amended Complaint, Aguilar stated at the *Spears* hearing that he first arrived at the medical department around noon on October 6 and it was not until around 2:00 p.m. that NP Sherrill made the determination to have Aguilar transported to UMC. Tr. 2:49:08–:51:22. To the extent Aguilar intends to assert a delay claim based on the time lapse between noon and 2:00 p.m., he has not stated a claim. *Id.* First, he does not sue Nurse Page—the individual personally involved in administering any medical care during that time. Am. Compl. 5–11, 14. Moreover, Aguilar's allegations indicate that Nurse Page did not ignore or refuse to treat him but was instead determining the appropriate course of treatment. *Id.* at 14.

[17] The undersigned has entered an order requiring Aguilar to provide descriptive information for John Doe COs #2 and #3 and Jane Doe Nurse. Prior to requiring an answer, the undersigned recommends that the district judge direct the Office of the Attorney General for the State of Texas to identify all individuals matching the descriptions provided by Aguilar, if he complies with the order.

## IV.    <u>Right to Object</u>

A copy of this Report and Recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of this Report and Recommendation must file specific written objections within fourteen days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  To be specific, an objection must identify the specific finding or recommendation to which the objection is made, state the basis for the objection, and specify the place in the magistrate judge's Report and Recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

Dated:  February 29, 2024.

_____
**D. GORDON BRYANT, JR.**
**UNITED STATES MAGISTRATE JUDGE**